Phase 13-1853, Bellwether Community Credit Union v. CUSO Development Company LLC. Oral argument not to exceed 15 minutes. Ms. Benedetto for the appellant. Good morning. Mary Rourke Benedetto appearing on behalf of the plaintiff appellant Bellwether Community Credit Union. I have reserved five minutes for rebuttal. Okay and you may proceed. Okay basically I know that the panel is well aware with the briefs and what's going on in this case. This is a situation in which Bellwether Community Credit Union sought to withdraw from the defendant CDC LLC which was a credit union service organization. And it's inconceivable based on the party's practice with each other, based on reviewing the operating agreement as a whole, based on the admissions made by the defendant CEO, based on the party's past practice and course of dealing, and based on equity that we would find ourselves where we are today. Which is Bellwether Community Credit Union was permitted to withdraw under the operating agreement. But they were not compensated for their interest in the company which CDC had booked as $655,233. They still own 50 units in the LLC but they're no longer a member and they can't sell it to anyone. And under the district court's analysis they can, CDC can dispose of this capital account as they will. And actually that seems to me that it amounts to conversion of Bellwether's interest in the company. Wait, isn't Bellwether free to sell it to whoever they want once they get? No, they cannot your honor. Based on the operating agreement under section 11.4 of the 11.4C, if the company, this is under the purchase option section, if the transfer does not transfer the interest within the free transfer period, the right to transfer shall cease. So they don't have a right to transfer it. They have nothing. Don't they have the right to transfer the shares within a specific time period and then if that period expires then they lose the right. Is that not the case? Right. So that period expired and now they have nothing. But it expired because your client chose not to sell the shares to a third party. Is that correct? Well, that is not necessarily true your honor. What happened here was the transfer of shares provision, which is the 11.4, first of all, going back when Bellwether gave its notice that it was withdrawing from the credit union, the CDC responded by saying, okay, you're withdrawing, then what we're going to do is pay you the fair value of your interest in the credit union. And that was in February of 2011. And that is our exhibit 9 from our motion for summary judgment and CDC's exhibit G. And then subsequent to that, the credit union said, no, we're not going to pay you that. Right, because there was a mistake. They mistakenly thought the amendment had gone through that would require them to purchase and everybody acknowledges that was just a mistake, right? I actually don't think that everybody acknowledges that that was a mistake, your honor, because in this case, the it goes on course of dealing and it goes on the amendments. But what had happened with every previous member of the credit union who withdrew, they were paid or they were offered to be paid the adjusted capital balance, their interest in the credit union. And there had been an offer of purchase, or there had been an offer made to America First Credit Union. That was in 2010. That was before this so-called meeting happened at which a vote was held on the proposed amendments. And even when we had the vote on the proposed amendments, by all the uncontroverted documents, the vote occurred sometime in December and the results were known in January of 2011. It was in February of 2011 that the CDC said, we will pay you the fair value interest. And then at a subsequent point to that said, oh no, we're not going to do that now. Now, what I will acknowledge is that my client said the vote that was taken was not a proper vote and it was not amended at that time. His point was it wasn't amended as to a subsequent section, section nine. And his point was there was irregularities in the vote. And I don't think there's any dispute that there were irregularities in the vote. This poor man was supposed to look at this operating agreement, which is, you know, a length of time, but I don't think there's any dispute that there were irregularities in the vote. And he had a lengthy, 27 pages, I think, document on some kind of a web portal that he had handwriting all over. And it wasn't to him something that was procedurally, you know, proper that he could read. And he made that known to the credit union. But the point is that after they said they were going to pay it, then they said, oh, no, we're not. And oh, by the way, we've unilaterally rescinded the offer also to America First. And have never given any indication of what the authority is for that. That's the problem that happens with this case. The defendant says that, you know, the case lives or dies on the operating agreement, but uses that operating agreement fast and loose however they deem appropriate. They didn't file the articles of, they didn't indicate in the articles of organization that it was something that was going to be managed by a board of managers as required under the Michigan statute. So it was flawed from the inception. It admittedly didn't, you know, handle the vote correctly. And the thing about the ultimate decision is that if they offered in February of 2011, if CDC offered to Bellwether to pay them for the fair value of their interest in the credit union, then that was an action that was authorized by the board, as indicated in the February of 2011 letter. It had to have been, because they couldn't have acted unilaterally. And even if, even if you say that section 12.2B was not amended, that's really irrelevant. Because the credit union could still do what they did. That is that the credit union could still offer, could still pay Bellwether that amount, which is what they had done to every previous withdrawing member. What's the part of the agreement that you say authorizes that occurrence? Okay. Well, there would be a few, Your Honor. First of all, under Well, first of all, under 11.4, one could argue, and this is where, you know, I know we're arguing in the alternative. Either the operating agreement is uncontroverted and it's silent as to withdrawal provision and judicial withdrawal distribution, and therefore the Michigan statute comes in. Or it is ambiguous and it has to be construed against CDC. But under section 14, excuse me, article 11.4A, the company may elect by majority of vote to purchase with written notice of the transfer. So one could say that this falls under that provision. There is a written notice to transfer. Also, Your Honor, the, under article 8, no, excuse me, under article 7.3, day-to-day management of the board and CEO. And under that, it says majority consent. And under that, 7.3F says, care for and distribute funds to the members by way of cash, income, return of capital, or otherwise, all in accordance and subject to the provisions of this agreement. The only point that we ever got to the supermajority, I'm not disputing that it says in the agreement that it required a supermajority to modify the contract. But it also said the supermajority was required for disposal of one's capital account. I don't equate disposal, and that was the decision that was reached by the district court. I don't equate disposal with a withdrawal distribution. To me, that disposal probably goes to what CDC will try to do with our account once they dispose of it, disperse of it within their members if they choose to do so. I just want to make sure you cited section 11.4 as one of the provisions upon which you rely for your argument. And I'm not entirely clear on the manner in which you rely on it. It seems to me that 11.4 provides a mechanism for a withdrawing member to recover value of shares. And the first thing is that the shares can be bought back by CDC itself. And that's just an option, a purchase option that CDC apparently has. It can choose to exercise it or not. And if CDC does not exercise it, then the withdrawing member would offer the shares to other members of CDC. And if they don't opt, then the shares can be sold to a member of the public within this time period. So could you make it clear what provision of 11.4 you think most strongly supports your argument? Well, a few, Your Honor. First of all, under 11.4, the withdrawing member is not required to offer its interest. Secondly, Article 12 of the agreement is the only one that refers to a dissociating member, and it doesn't say anything about withdrawal provisions in there. It does send us to 11.4. But I feel, Your Honor, that you have to look at the operating agreement objectively rather than situationally. That is, you can't say, well, if they had agreed to purchase it and we paid the whole interest, then that would have been a withdrawal distribution. Well, no, because if they didn't, then it's not. So then there isn't an additional withdrawal distribution. But what I just argued is, because these provisions are so convoluted and they contradict each other so much, so we withdrew. We notified withdrew. Less than a month later, they said, okay, this is what we're going to pay you. Well, maybe under 11.4, that's what they decided that they were going to pay us, and that's what they should pay us. Well, your red light's been on for a while. You'll have your full rebuttal time. Thank you. Thank you, Your Honor. Appreciate it. Good morning, Your Honors. Good morning. Adam Brody and Tim Monsbaum on behalf of the ApoE CDC. I want to address first the issue of whether they had the right to sell the shares. They absolutely did. They had that 90-day window, and their CEO testified under oath. They chose not to even try. They didn't even try to sell them because they couldn't justify the price. So they absolutely had the chance to do it, and they chose specifically not to avail themselves of that. Just curious, why is it if in the past operating just the way the CDC operated, they had always bought back withdrawing members' shares, why did they not do it in this case? Well, they didn't always buy back withdrawing members' shares. They had a specifically negotiated deal with workers' credit union that wasn't necessarily based on the value of their capital account. They were then going to amend the operating agreement to require that, and they changed their minds. They decided they didn't want to operate that way. And with respect to America First, it's important that you look at the disassociation agreement because it makes it clear that that offer that was going to be made to America First was based on what was going to be the amended 12.2B. It talks specifically in the disassociation agreement about that. So essentially, Judge, they wanted as a gesture of good faith, and that's in the record as well, to pay workers' credit union upon their withdrawal. America First, that was in the time frame where they were going to amend it to say, we're going to pay your capital account over five years. Then the decision was made internally after it was voted down to not do that. But the fact of the matter is that agreement was never amended, and there was no course of conduct that would show that this is what we're going to do with every single withdrawing member going forward. Are these shares really worth nothing? Is that the problem? That's what Bellwether thinks. I mean, Mr. Leckweyer testified specifically no credit union in their right mind would pay $655,000 for these 50 units, which is why he didn't even try to sell them. But I mean, Bellwether paid $300,000 for the 50 shares initially, right? Well, they did, and I think it's important to recognize the structure of CDC and the purpose of CDC. It's not an investment vehicle. It's a service organization. The reason for joining is to bolster your own offerings to your credit unions as a member like Bellwether. So it's not like they're investing in this hoping to get some return on their capital. What they're doing is pooling resources so they can better service their credit unions, if that makes sense. But I mean, apparently Bellwether thought it was worth $300,000 to do that. They thought it was worth $300,000 to join this cooperative to try to better enhance the services they could offer. You know, Bellwether seems to argue that Section 11.4 really deals with the transfer of shares for members and that it doesn't deal specifically with a withdrawal distribution. What amount a member would receive for shares upon withdrawal? Well, how would you respond to that argument? What I would say is this, Your Honor. 11.4 is specifically incorporated into 12.2 that deals with withdrawing members, right? If you look at the definition of a distribution under the Michigan LLC Act, there's no question that a payment under 11.4 in exchange for those shares is a distribution. I mean, it's a very broad definition. It's a direct or indirect transfer of money by an LLC to or for the benefit of its members in respect of their interest. If CDC had elected to exercise its purchase option under 11.4, there is no question that is a withdrawal distribution under the definition of distribution in the Michigan LLC Act. And that's really what this comes down to. Is the agreement silent? Does it require a withdrawal distribution? Does it say you're never going to get one? Is it silent? Does it make no mention of withdrawal distribution? And it clearly does. It says there's this mechanism when you withdraw under Section 12, we go to Section 11.4, and we have the right to purchase your shares at the transfer price. If we had made that payment, that's a distribution. Is there any case you have directly on point that supports you? There is. Well, the definition of distribution, the Florence Cement case that we cited, which talks about this broad definition of what a distribution is. And really, it's the concept of interpreting contractual language. Basically, there is no case directly on that. There's no case that directly addresses our situation, no. But the fact of the matter is we're looking at the contractual language. We're analyzing the contractual language. And the question is, is it silent? And you can't say based on some external fact, i.e., whether we exercise the purchase option, it's silent. But if there's a different external fact, it's not silent. It is what it is. The language is what it is. It's either silent or it's not. Well, it's either silent or it's not. But do you argue that there is no ambiguity in the language? Is this an operating agreement? Absolutely. And they agreed with that below at the district court level. I know they're now changing their minds and trying to argue it's ambiguous. But it is not. It specifically sets forth the process for a withdrawing member, what they're going to get paid, when they're going to get paid. There's no ambiguity there. The agreement is silent on how the transfer price is reached. I'm sorry. What's that? The agreement is silent on how one reaches a transfer price. That term is referred to somewhere in the, maybe in 11.4. Maybe it's not transfer. I guess it's purchase price. I believe that's set by the withdrawing member. They decide what they want to offer the shares for. And in this case, they just said, I'm going to take my capital account, divide by 50, and that's the unit price per unit. And that only goes to what they would offer for CDC as opposed to how any other? Or any other third party, correct. Or a third party. Yes. And I want to touch briefly on this idea that Mr. Davis' supposed admission that it's silent or the memo, which is privileged and shouldn't even be part of this case, somehow can change the analysis. With all due respect to my client, it doesn't matter what Mr. Davis thinks that agreement means. He's not entitled to interpret it and have it be legally binding on the company. Again, the language is what it is. So whether he thinks it's silent or an attorney at a law firm five years ago thought it was silent, it's irrelevant. And they can't rely on that to say, aha, you've admitted it. You're stuck with that. And I think it's important to note their argument on appeal with respect to Section 7.6. They specifically say that a payment to a Class B member who's ousted from the board for their units is a withdrawal distribution. They say that on page 11 of their brief. They say that on page 20 of their brief. They say if you have a Class B member who's kicked off the board and the company buys their units back, that's a withdrawal distribution. That's exactly what the payment under 11.4 is. Member leaves the company, gets paid for their units. So they can't say on one hand 7.6 is a withdrawal distribution for a Class B member, but somehow a payment under 11.4 to a Class A member isn't. You know, the Michigan Limited Liability Act speaks in terms of an additional withdrawal distribution. Yes. So what significance does the word additional have on our analysis today? It should have no impact on your analysis, and here's why. If you start at the beginning of that statute, it talks about a withdrawing member's right to share in distributions until the effective date of their withdrawal. So if you say in January you're going to be out, but it's effective at the end of March, to the degree the company makes distributions in that intervening period, you're entitled to share in those. Then it goes on to talk about an additional distribution. So in addition to the regular course of business distributions, you get an additional one when you withdraw. That equates to the fair value of your interest if the operating agreement is otherwise silent on that issue. So the word additional doesn't mean here's one withdrawal distribution, then there's an additional withdrawal distribution. It is here are the ordinary course of business distributions, and then you get an additional one when you withdraw. And is a distribution different in kind than a transfer of units as contemplated by the operating agreement? Not when it involves a transfer of money, because under the definition it is a direct or indirect transfer of money by the LLC to the member. So whether there's a transfer of the units or not, when we're buying them, as we would under 11.4, if we exercise a purchase option, it's the same. It's still a distribution. Very briefly, on this issue of the amendment of the agreement through this vote or this course of conduct that they keep arguing about, there was a vote taken in January 2011. They claimed in their briefing that there was a supermajority. They misread the record. There were only five out of eight votes. It was never formally amended. It got voted down. And then they try to argue, well, of course, a conduct based on workers' credit union based on America First. Well, workers' credit union, we've talked about that. That was an individually negotiated deal. America First, we talked about that. That was all at this time where 12.2 was going to be amended to require this, and that's very specifically set forth in the disassociation agreement. But I think this is the most important fact on this course of conduct argument. You have all these things that happened before January of 2011. Then you have a specific vote that would require them to amend the agreement to pay this out over five years, and it got voted down. They explicitly manifested their intent not to require this in January of 2011. So anything that happened before that can't be the basis of a valid course of conduct argument when you have this express manifestation of their intent not to amend the agreement that way. This issue of Tom Davis made an offer in his February letter. Tom Davis didn't make an offer in his February letter. He didn't make a promise. He thought it had been amended. If you read the letters, it's very clear he's basing it on what he thought was the amended language of 12.2b. Mr. Lecquier thought the same thing. He said, no, no, no, that didn't get amended. I'm relying on course of conduct. He didn't say, I accept your offer under 11.4, or I accept your offer under Section 8. He specifically said, I'm relying on what you did with workers and what I think you did with America First. So there was no separate agreement between the two, very clear from the correspondence that was exchanged. What was the percentage of the supermajority required? It was 75%. So it would have had six to eight. And what happened, Your Honor, was an initial email went out that said, here's kind of where I think everybody's at. Let me know if I'm right. And there were six yeses. And then one of those members who was in the yes column responded and said, no, you got this all wrong. I'm not voting in favor of it. So that's, I think, where the confusion came in. On this issue of the equitable argument, they try to make this unjust enrichment claim. I have a couple of points on that. Number one, you can't have an express contract like we have here and then have some type of unjust enrichment claim. The law doesn't allow that. But even if they could, there's no factual basis for it. This is a sophisticated business. They had the chance to read the operating agreement. They had a chance to have counsel review the operating agreement. They voluntarily entered into the operating agreement. And now they can't come back and say, well, this isn't fair the way this worked out. They're big boys. They knew what they were getting into. So there's nothing inequitable about holding them to the agreement that they signed. And then just briefly on the issue... I'm curious. Could they re-tender at a lower price or they just have one shot under this operating agreement? Let's say they came back and said, all right, we'll sell it for $300,000. Could they do that and then have another 90-day window? I don't know if it would re-trigger a 90-day window. I'm not certain if they could say, we want $13,000 a unit and we say you're out of your mind, and they say, okay, we'll take $10,000 or we'll take $5,000. I don't know the answer to that, Your Honor. But the fact of the matter is they didn't even try after we said we didn't want to buy them. They could have gone to some third party under the operating agreement and said, we want, you know, to be paid for this. They'd have to use the same $13,000-something per share. I mean, they couldn't offer it lower... To the third party. ...to the third party than they offered it to. They probably would have to offer it the same. But, you know, they wanted to get their $655,000. That's how they set their price, and that was their decision. And then Mr. Lecquier specifically said, I can never sell this to a third party. There's no way I can justify this price. And that goes back to this equitable argument about, you know, we've been damaging the amount of $655,000. Well, it's not actually worth that. I mean, and that's clear. And Mr. Lecquier admitted that. And on the issue of damages, I want to touch on that briefly. The district court didn't get to that issue. It didn't need to. But it's an alternative basis to affirm. They presented no evidence of damages. They basically presented unsupported argument saying, fair value of my interest equals balance of my capital account. There's no authority for that anywhere. What we do know is they had no valuation done. Mr. Lecquier, as I said, admitted no credit union in their right mind would pay $655,000 for these units. They didn't even try to sell them to a third party. And maybe most importantly, if you accept their argument that fair value of your interest equals balance of your capital account, that leads to absurd results. They owned 50 units. Other members owned 50 units. And they have different capital account balances. There's no logical way to say my 50 units are worth this and the exact same 50 units in the same entity are worth something different. So there's really no basis in law or fact to say fair value equals balance of my capital account. It's their burden to prove damages. They didn't even try to do that. They just made their argument. And we cited the case law for the court that said they can't rely on speculation or conjecture or guesswork to establish damages. So even if you want to say there was some breach of the operating agreement or they're otherwise entitled to a distribution, they failed to prove damages and that's an alternative basis to affirm. Unless you have any other questions. Okay. Thank you, Mr. Brody. Just to address the last first, or maybe not the last, but again, especially Judge Gilman, when you were talking about the offering the purchase to someone else and why didn't Bellwether do this and they could have done it. But I would direct the court's attention to paragraph 11.2 of the operating agreement and that's the transfer of units. And under that transfer of units, it says, the transfer assignment of the units pursuant to this article will not result in the transfer assignment of any of the memberships of the transfers other membership rights. And the transferee will have no right to become a member or a manager. Further, so that is, if you did sell these rights, you would not get any voting rights, you could not be a manager and you could not be a member unless CDC agreed to that. But more importantly, why did CDC want to withdraw in the first place? This was a credit union service organization that was supposed to be providing mortgage service agreements and didn't do it. And that is on the exhibit that Mr. Davis wrote on exhibit G of the motion for summary judgment brief filed by CDC. They didn't do what they were supposed to do and during the course of the time when they didn't provide the service agreements, Bellwether was also hamstrung by this operating agreement that it couldn't use any other ones. So what was there to sell to any other third party? And that was the frustration that Bellwether had in this case. And counsel says, you know, Bellwether was a sophisticated party and they were advised by counsel. Well, in this operating agreement, CDC could have said in the operating agreement, A, you can't withdraw ever. Some operating agreements say that. B, you're not going to be getting any withdrawal distribution. Some operating agreements say that. And when you have that in there, then you know, eyes wide open, what you're getting yourself in for. And if you decide to sign up for that, that's what you decide to sign up for. It didn't say that here. And when they were faced, when CDC was faced with withdrawals from members, did they get together and talk and say, all right, we're going to amend this so that there can't be any foreclosures or we're going to amend this so that there won't be any withdrawal payments? No. They said, what we're going to do, we're going to get together and we're going to amend this and we're going to reflect it on the past practice, which is to pay our withdrawing members the value of the interest of their adjusted capital account. That's exactly what they said. That's exactly what Tom Davis said. And the point in the, excuse me, the question that has never been answered by CDC is, why didn't they pay Bellwether? They said that they were going to pay Bellwether the adjusted value of their capital account over five years. Tom Davis says, well, we just didn't. Well, why didn't you? Well, I don't know. You say you're going to do it. I've given you the, there's authority within the provisions that you can make. Say it's not under a withdrawal. Say it's not under the transfer. That, the board must have decided. Because Tom Davis can't unilaterally offer to pay people, he can't unilaterally do that. It had to be a board decision whereby those people said, here's our member. They're withdrawing. This is what we're going to pay them. Well, that's the agreement that you made. Then honor that agreement. And just with regard to the distinction between the Class B withdrawing members and trying to equate that to 11.4. So you have these Class B members who in this case were withdrawn for irregularities and who exposed CDC to liability. But under the provisions in Article 7, they're completely made whole. And they, and it says must. It's not discretionary. And that's the distinction with the difference in this case because in 11.4 it says, well, maybe we can, but maybe not. So then that is not a withdrawal distribution. Again, that's something that indicates that there is no withdrawal distribution with regarding to Class A members. And finally, you can argue that the passage that we cited at page 17 of our reply brief that had from the workers credit union disassociation agreement wherein they also paid them the adjusted value of their capital account. And it said that all others, said the parties hereby agree that any operating agreement for the company shall be and hereby is amended by revising its provisions to show the withdrawal of the assigner, the cancellation of the assigner's units, and to otherwise conform to the intent hereof. The intent was to pay withdrawing members the adjusted value of their capital account. Okay. Thank you, counsel, for your arguments. Thanks to both of you. We appreciate them. And the case will be submitted. Thank you. You may call on the next case.